## UNITED STATES v. PETERSON.

### No. 5637.

Circuit Court of Appeals, Seventh Circuit.

June 8, 1936.

Michael L. Igoe, U. S. Atty., of Chicago, Ill., Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Wm. B. Waldo, Sp. Assts. to the Atty. Gen., and A. F. Prescott, of Washington, D. C., for the United States.

J. S. Seidman, of New York City, for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Appellee brought this action to recover $24,401.68 and interest, which was the amount paid as taxes upon the income of P. A. Peterson for the year 1926. Judgment for said sum was duly entered, and this appeal followed.

P. A. Peterson will hereinafter be referred to as the deceased. He died June 9, 1927, before filing his 1926 income tax return. Appellee is his widow and was named as executrix of his estate, which was closed June 21, 1929. The claim sued upon was assigned by said estate, and, if a recovery be had, appellee's right thereto is unchallenged.

The 1926 income of deceased as reported showed a net taxable income of $115,990.66 and a tax liability of $14,839.63. This tax was paid. In computing the net income the taxpayer reported a loss growing out of investments in the Stonefield Evans Shoe Company, hereinafter called Stonefield. The Commissioner allowed a deduction of $138,678.41, the amount of deceased's investment in the capital stock of Stonefield, but disallowed the balance of the alleged loss, to-wit loans to Stonefield. The Commissioner determined a deficiency tax of $7,611.16 and assessed the same to-

gether with interest amounting to $2,060.61 against the estate of deceased, and the same was thereafter paid. A claim for refund was thereafter made and rejected.

The transactions out of which the alleged losses arose occurred in the calendar year 1926. Stonefield, a shoe company in which deceased was the principal stockholder, holding approximately 75% of the outstanding stock, became financially embarrassed. In addition to holding the majority of the stock, Peterson was also a creditor in the sum of $295,598.62. Stonefield also owed banks $89,926.19, which indebtedness was guaranteed by deceased. In June, 1926, the company was insolvent.

Deceased proposed to the other stockholders that he would take the assets and pay the losses as far as the assets would go. This seemed to be acceptable to the other stockholders, but the plan was changed before it was effectuated. The stockholders of Stonefield met and remet and authorized the directors to dispose of the company's assets to such persons "as will assume to pay and will pay all the indebtedness of the company." Following said meeting a new corporation was organized, known as Certified Shoe Corporation, hereinafter called Certified. It proposed to purchase all of the assets of Stonefield and in payment thereof to assume and pay all of its indebtedness. The Board of Directors of Stonefield authorized the officers to convey its property to Certified "in consideration of * * * Certified * * * assuming and agreeing to pay all of the debts and obligations and liabilities of this company * * * due to any and all of its creditors." Incorporation of Certified followed. Certified accepted the offer of Stonefield and agreed to purchase the property "in accordance with said proposal." Deceased subscribed for 3,000 of the 3,140 shares. At or about the same time deceased made a proposal to the Board of Directors of Certified that he would assume and agree to pay all of the bank's and *"all other indebtedness of Stonefield to him,"* for fully paid up capital stock in this company at par. This proposal was accepted by Certified. 3000 shares of its stock were duly issued to deceased, and the $295,000 indebtedness to deceased was satisfied. The bank's obligations were reduced by Certified in 1926, but not all of said indebtednesses were paid that year. Certified continued to operate until 1930 when it liquidated.

Controversy is over the year when the loss occurred.

The District Court found:

"In 1926, P. A. Peterson ascertained $161,999.27 of indebtedness owing him by Stonefield Evans Shoe Co. to be worthless and in 1926 charged off said amount."

Appellant insists that neither fact set forth in this finding is supported by the evidence.

If there be any substantial evidence to support this finding, the judgment must be affirmed.

The difficulty which this case presents is, however, traceable not to disputed facts but to reaching the proper conclusion from undisputed facts.

It is not hard to visualize the reasoning of the learned District Judge. He brushed aside the forms of corporate instrumentalities through which the deceased conducted the shoe business and charged him with assets of Stonefield and credited him with the debts of said corporation which he assumed. The balance he permitted the deceased to deduct from his 1926 income. The process is not without support of appealing reasons. Appellee argues: Deceased suffered a bona fide loss. Why not allow it? The loss really occurred in 1926, although as in many similar ventures the investor did not realize it until years later.

The reasoning of the court was partly right and partly wrong. That there was a loss must be, and is, admitted. That the amount of the loss equaled the sums claimed as deductions in deceased's 1926 income tax return is likewise not questioned. It is also true that the loss of the stock on Stonefield occurred in 1926. The Commissioner permitted that deduction.

The narrow question then is: Did the deceased also lose his loans to Stonefield or part of them in 1926?

The error in the reasoning of appellee's counsel is due to his failure to appreciate that deductions from a taxpayer's income are governed by statute. Losses are permitted as deductions from taxable income only because of the statute. The year when such deductions may be made is determined by actualities, and neither the taxpayer nor the Commissioner may make facts fit theories. Applicable statutes and regulations must be determined by the facts.

Section 214 (a), Revenue Act of 1926 (44 Stat. 26), provides:

"In computing net income there shall be allowed as deductions: * * *

"(7) Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part."

Regulations 69, Article 151, reads as follows:

"*Bad debts.*—Bad debts may be treated in either of two ways—

"(1) By a deduction from income in respect of debts ascertained to be worthless in whole or in part, or

"(2) By a deduction from income of an addition to a reserve for bad debts.

"Taxpayers were given an option for 1921 to select either of the methods mentioned for treating such debts. * * *

"Where all the surrounding and attending circumstances indicate that a debt is worthless, either wholly or in part, the amount which is worthless and charged off or written down to a nominal amount on the books of the taxpayer shall be allowed as a deduction in computing net income. There should accompany the return a statement showing the propriety of any deduction claimed for bad debts. * * * Before a taxpayer may charge off and deduct a debt in part, he must ascertain and be able to demonstrate, with a reasonable degree of certainty, the amount thereof which is uncollectible. * * * In determining whether a debt is worthless in whole or in part the Commissioner will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor. * * *

"Where the surrounding circumstances indicate that a debt is worthless and un-collectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction. Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt. * * * *"

When deceased offered to accept 3000 shares of Certified stock in payment of his debt, he made it impossible for the Commissioner or the court to hold that the debt thereupon became a bad or a worthless debt *and* was charged off that year.

When Certified was organized it acquired all the assets of Stonefield Company. The capital stock of Stonefield was thus wiped out. Deceased's loss in Stonefield's stock was then and there fixed and was properly allowed as a deduction. But, through the elimination of Stonefield as a corporate entity and the loss of the Stonefield stock, Certified came into existence and became a going concern with deceased the principal stockholder. Acceptance of the fully paid Certified stock of the par value of $290,600 in exchange for debts against Stonefield aggregating $295,000, negatives the suggestion that the latter were "ascertained to be worthless and charged off" that year.

If deceased ascertained the debt was worthless and was charged off in 1926 he proceeded in a most non-understandable and unusual manner to do so. Organization of a $300,000 corporation and the payment of stock therein through the satisfaction of a debt which said corporation had assumed, hardly indicates that the deceased was charging off a worthless debt as specified in section 214 (a) (7). A contrary conclusion is unavoidable.

The judgment of the District Court is reversed, and the cause remanded with directions to proceed further in accordance with the views here expressed.